J-S59017-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| WILLIAM R. WELSH, | : | |
| | : | |
| Appellant | : | No. 8 WDA 2015 |

Appeal from the Judgment of Sentence July 31, 2014,
Court of Common Pleas, Allegheny County,
Criminal Division at No. CP-02-CR-0010682-2013

BEFORE:  BOWES, DONOHUE and FITZGERALD*, JJ.

MEMORANDUM BY DONOHUE, J.:             **FILED SEPTEMBER 29, 2015**

William R. Welsh ("Welsh") appeals from the July 31, 2014 judgment of sentence entered by the Allegheny County Court of Common Pleas following his conviction of third-degree murder.[1]  Upon review, we affirm.

On July 26, 2013, Welsh, age eighty-nine, shot William Menni ("the victim"), age fifty-eight, twice in the neck, killing him.  The two had previously been friends and coworkers for over twenty years, working together at the funeral home Welsh owned in Homestead, Pennsylvania. The two had shared a father-son relationship, with the victim also sharing a close relationship with members of Welsh's family.

In or around May 2013, the owner of property located across from the funeral home and adjacent to the funeral home's parking lot was interested

---

[1]  18 Pa.C.S.A. § 2502(c).

*Former Justice specially assigned to the Superior Court.

in having someone demolish the house situated on the neighboring property, and the Welshes asked the victim if he could help find someone to complete the work. The victim decided to do the work himself, with the help of Ralph Zimmerman ("Zimmerman"). According to the Welsh family, this led to the deterioration of the relationship between the victim and the Welshes. Welsh's son, daughter and granddaughter, all of whom testified on his behalf at trial, stated that the victim became incensed when Welsh would not permit him to run cables across or place dumpsters on the funeral home's parking lot. The victim reportedly spoke very aggressively to and made numerous verbal threats against Welsh and his family members, including wishing Welsh "had a heart attack and fucking died so that he wouldn't have to deal with [the Welsh family]," and, speaking to Welsh's son, saying he was "going to get yous [sic]." N.T., 4/8-11/2014, at 171-72, 178-79. According to the testimony of Welsh's family members, this caused them to fear for their own safety and Welsh's safety in particular.[2] Welsh's son and adult granddaughter described being "petrified," "shaken," and "scared" after such interactions with the victim. *Id.* at 172, 182, 225.

Welsh reportedly became housebound out of fear for what the victim might to do him. Dr. Lawrence Nelson, Welsh's neighbor, testified to an interaction between the victim and Welsh that he observed occur in the

---

[2] The record reflects that Welsh lived in the second-floor apartment above the funeral home, and Welsh's granddaughter lived in the third-floor apartment.

weeks leading up to the victim's death. According to Dr. Nelson, Welsh came out of his house and began to cross the street. The victim was at the demolition site and upon seeing Welsh, the two "stopped and looked at each other." *Id.* at 242. The victim reportedly "started coming at [Welsh] kind of in a like rapid walk," prompting Welsh to turn around and walk back into the funeral home. *Id.* Welsh went inside the funeral home and the victim "started beating at the door," saying, "'come out, you little girl. Talk to me.'" *Id.* at 243. Dr. Nelson saw the victim attempt to open the door with a couple of keys that he had, but he was unsuccessful.

Dr. Amer Ziad Akhrass, Welsh's physician, saw Welsh "in early 2013," and noticed a "drastic change in [Welsh's] status when he came in [for an appointment.]" *Id.* at 196. Welsh informed Dr. Akhrass that "he's been very stressed" because of "encounters with a certain individual in his neighborhood for the last month or so," which "has been causing him a lot of anxiety or stress." *Id.* at 196-97. When Dr. Akhrass asked Welsh if he could avoid this individual, Welsh responded that he could not, as "the individual is very aggressive[.]" *Id.* at 197. Dr. Akhrass admitted, however, that drastic changes in a patient of Welsh's age were common.

On July 26, 2013, Zimmerman, the victim's adult son and his son's friend were working at the demolition site. The latter two went to lunch and a short time later, the victim came to the property. Upon seeing the victim at the site, Welsh put a loaded .380 caliber Kel-Tec pistol in his pocket and

walked through the parking lot and called the victim's name. The victim approached Welsh, and Zimmerman overheard the two speaking. According to Zimmerman, Welsh told the victim he wanted debris that was on his parking lot to be cleaned up, and the victim responded that he would have his son and his son's friend clean it up right after they returned from lunch. Zimmerman turned his back as the two continued their conversation, which Zimmerman stated was in a normal tone. Zimmerman then heard a gunshot. He turned around to see Welsh fire a second shot at the victim. The shooting was also witnessed by two neighborhood children, ages twelve and nine, who knew the victim and identified Welsh as the shooter. Zimmerman ran over to the victim and called 9-1-1. Welsh observed him on the phone and said, "Call the [f]'ing police. I don't care what you do," and then walked back to the funeral home.

The police came to the funeral home and found Welsh sitting outside on the porch. Upon being asked about the location of the gun by Jeffrey DeSimone, Chief of the Homestead Police Department, Welsh informed him that he had placed it inside a planter, and directed Chief DeSimone to the room in which the gun was located. Welsh's granddaughter came downstairs and, in the presence of the police, asked what was going on, to which Welsh replied that he "shot the son of a bitch." *Id.* at 120. Chief

DeSimone provided Welsh with his *Miranda*[3] warnings, and another officer at the scene, Corporal Stephen Adams, re-*Mirandized* Welsh upon Chief DeSimone's departure to return to the crime scene. While sitting outside, Welsh again said to Corporal Adams, "I shot the son of a bitch." *Id.* at 128. Approximately ten to fifteen minutes later, Welsh's daughter came to the house and asked what happened, and Welsh responded, "I screwed up. He's still alive." *Id.* at 129.

Chief DeSimone had known Welsh for approximately twenty years and stated that Welsh's demeanor while speaking with him was "normal." *Id.* at 121. Corporal Adams likewise testified that Welsh seemed "calm and collected and aware of what had taken place." *Id.* at 129-30. Welsh's daughter, on the other hand, described Welsh as appearing "gray" and "[un]aware of the situation," and his granddaughter described him as being "in shock and scattered," and that while she was standing on the porch with him, he was unable to focus on her and forgot she was there. *Id.* at 209, 232-33. Welsh's granddaughter stated that while she was calling Welsh's son for help, she heard the police questioning Welsh, but that Welsh was not answering the questions asked, instead "talking about his time in Normandy." *Id.* at 233. Corporal Adams also testified that Welsh spoke about being a World War II veteran, but indicated that it was something he spoke of in the course of their conversation.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Welsh was subsequently taken into custody and gave a statement to Detective Venerando Costa of the Allegheny County Homicide Unit after once again being advised of his **Miranda** rights.

> [H]e said ["]no bullshit. I'll tell you what happened.["]
>
> He said he was tired. Him [sic] and [the victim] were in a long-term – an argument. He was tired of being pushed around by [the victim] and that he shot him.
>
> \*    \*    \*
>
> Mr. Welsh said he retrieved his gun from a closet, put it in his pants pocket, that he walked outside, walked to the parking lot. He got involved – that he began arguing with [the victim]. … He stated it stemmed from the demolition of the house that was being demolished[.] … [E]verything had to be [the victim']s way. Mr. Welsh kept saying … ["]my way, my way, my way[,"] referring to [the victim] wanting his way all the time. … He stated that they got into an argument, the he believed [the victim] pushed him, and that he pulled out his gun and shot him two times.

**Id.** at 144-45. Following his arrest, Welsh spoke to the media, admitting on camera that he shot the victim and stated, "Harassment all the time. Ask some of the borough officials down at the Borough, Homestead Borough Building." **Id.** at 151.

The Commonwealth charged Welsh with criminal homicide. At a bench trial commencing on April 8, 2014, witnesses testified to the above-summarized information. Welsh also called several character witnesses,

most of whom spoke to his reputation in the community for being peaceful and law abiding, and some of whom spoke to the victim's reputation for being aggressive.

On April 11, 2014, the trial court acquitted Welsh of first-degree murder,[4] but also concluded that the evidence supported a finding that Welsh was guilty of third-degree murder, as opposed to voluntary manslaughter.[5] The trial court further found that the Commonwealth had satisfied its burden of proof to negate a finding of self-defense beyond a reasonable doubt.

Welsh filed a post-verdict motion challenging the weight of the evidence to support his conviction of third-degree murder instead of voluntary manslaughter. At the July 31, 2014 sentencing hearing, the trial court heard argument on Welsh's motion, ultimately denying the motion.

At the sentencing phase of the hearing, numerous witnesses testified on both sides. There were impassioned pleas for leniency made by Welsh's friends and family members, and impassioned pleas for a lengthy sentence made by members of the victim's family. After considering all of the testimony, the presentence investigation report, the sentencing memorandum filed by Welsh's counsel (which included thirty-nine letters in support of Welsh), victim impact statements, reports from the Behavioral

---

[4]  18 Pa.C.S.A. § 2502(a).

[5]  18 Pa.C.S.A. § 2503.

Assessment Unit, and the statutorily required information, the trial court sentenced Welsh to six to twelve years of incarceration.

Welsh filed a timely post-sentence motion challenging the discretionary aspects of his sentence. The trial court denied the motion on November 12, 2014.

This timely appeal follows, wherein Welsh raises two issues for our review:

I. Was the verdict rendered contrary to the weight of the evidence presented where highly credible and substantial evidence supported a finding of voluntary manslaughter, not third[-]degree murder?

II. Did the lower court abuse its discretion when it sentenced the 90-year-old appellant to a manifestly excessive and unreasonable period of six to twelve years of incarceration?

Welsh's Brief at 4.

We begin by addressing Welsh's challenge to the weight of the evidence, which we review according to the following standard:

A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the [factfinder] is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the [factfinder's] verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate

> review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

***Commonwealth v. Tejada***, 107 A.3d 788, 795-96 (Pa. Super. 2015) (citation omitted).

Welsh predicates his weight claim upon the testimony presented by his witnesses regarding the series of threats made by the victim prior to the shooting, which, according to Welsh, provoked him to act in a sudden heat of passion. Welsh's Brief at 24. The trial court provided the following explanation for its denial of Welsh's weight claim below:

> In this matter, the facts presented led this [c]ourt to find that malice existed as well as the specific intent to harm. First, Welsh retrieved a loaded gun from his closet, he left his house, and he crossed the street to begin a confrontation with [the victim]. As [the victim] was turning to walk away, Welsh pulled out his gun and shot him twice in the head and neck area. This [c]ourt did not find credible the testimony of Welsh's family that [the victim] was threatening and harassing Welsh to the point that Welsh would be in fear of bodily harm. Further, there was no evidence presented that there was sufficient provocation by [the victim] that would evoke a sudden and intense passion in Welsh such that it would negate the element of malice. Therefore, the verdict of third[-]degree murder was proper.

Trial Court Opinion, 6/9/2015, at 6.

"Third degree murder is a killing done with legal malice, but without the specific intent to kill; voluntary manslaughter is a form of homicide that involves the specific intent to kill, but contains no legal malice as a result of

passion and provocation." ***Commonwealth v. Buterbaugh***, 91 A.3d 1247, 1260-61 (Pa. Super. 2014) (en banc) (citing ***Commonwealth v. Pitts***, 404 A.2d 1305, 1308 (Pa. 1979)), *appeal denied,* 104 A.3d 1 (Pa. 2014). "Malice is defined as: wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured[.] Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury." ***Commonwealth v. Thompson***, 106 A.3d 742, 757 (Pa. Super. 2014) (citation omitted). "Malice may be inferred from the use of a deadly weapon on a vital part of the victim's body. Further, malice may be inferred after considering the totality of the circumstances." ***Commonwealth v. Garland***, 63 A.3d 339, 345 (Pa. Super. 2013) (citation omitted).

The record supports a finding that Welsh killed the victim and that he acted with malice when doing so. Upon seeing the victim outside, Welsh took a loaded gun and went to confront him about debris on his parking lot. N.T., 4/8-11/2014, at 79, 144-45. Other than Welsh's statement to police that he "believed" the victim pushed him, there is no indication of any aggression on the part of the victim during this confrontation. ***See id.*** at 145. According to Zimmerman, who was present throughout the conversation between Welsh and the victim, the victim did not show any

aggression prior to the shooting. *Id.* at 80. Thus, there was no evidence that the victim provoked Welsh on the day in question.

Furthermore, although Welsh's family members testified to threats and acts of aggression by the victim in the weeks leading up to the shooting and testified that they were "petrified, "shaken," and "scared," *see id.* at 172, 182, 225, the trial court did not find credible their testimony that Welsh was in fear of bodily harm. "[W]hen appellate review involves the trial court's findings of fact and credibility determinations, those findings are binding on the reviewing court if they find support in the record." *Commonwealth v. Myers*, 722 A.2d 649, 652 (Pa. 1998). Our review of the record reveals that it supports the trial court's credibility determination in this regard, as Welsh initiated the confrontation with the victim on the day in question without any apparent fear for his safety.[6]

The record reflects that Welsh shot the victim in a vital part of his body and then walked away without rendering aid, indicating that he did not care if Zimmerman called the police. When asked what happened, Welsh showed no remorse, stating that he "shot the son of a bitch," and expressed concern only when he thought that the victim survived the shooting. *Id.* at 120, 128, 129. Thus, based upon the totality of the circumstances, the

---

[6] There was nothing in the record to suggest that Welsh's act of bringing his firearm with him to confront the victim was a sign that he was fearful of the victim. There was no testimony that he did not carry his firearm in the normal course of his day when he left the house.

weight of the evidence supports a finding that Welsh killed the victim with malice. **See Thompson**, 196 A.3d at 757; **Garland**, 63 A.3d at 345. We therefore find no abuse of discretion in the trial court's conclusion that Welsh was guilty of third-degree murder.

The second issue Welsh raises challenges the discretionary aspects of his sentence, which, as Welsh recognizes, is not subject to our review as a matter of right. Rather, "[a]n appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence." **Tejada**, 107 A.3d at 797 (citation omitted). This requires the appellant to satisfy all of the following:

> (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post[-]sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

**Id.** (citation omitted).

Our review of the record reveals that Welsh satisfied the first three prongs. In his 2119(f) statement, Welsh asserts that his sentence is "clearly unreasonable," as his sentence is "manifestly excessive under the circumstances of his case, violating both 42 Pa.C.S.A. § 9781(c) and [the]

fundamental norms underlying the sentencing process." Welsh's Brief at 6.[7] Welsh clarifies that he contests the sentencing court's imposition of a "de facto life sentence," as Welsh is ninety years of age and in poor health. *Id.* He further points to numerous mitigating factors that the trial court failed to consider, including "Welsh's advance[d] age, his character, and his background, as required by the sentencing code," as well as his "physical and mental condition, his rehabilitative needs, and the lack of danger Mr. Welsh presents to the community at large." *Id.* at 6-7. We conclude that this presents a substantial question for our review. *See Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa. Super. 2014), *appeal denied*, 105 A.3d 736 (Pa. 2014). We therefore proceed to address the issue on its merits, which we review for an abuse of discretion. *Commonwealth v. Zeigler*, 112 A.3d 656, 661 (Pa. Super. 2015).

Welsh acknowledges that the trial court had the authority to enter the sentence it did, and does not contest that the sentence is below the mitigated range called for in the sentencing guidelines. *See* Welsh's Brief at 26; Trial Court Opinion, 6/9/2015, at 6. He asserts, however, that his sentence is nonetheless excessive based upon his age, his absence of criminal history, his acceptance of responsibility, his physical health

---

[7] Welsh's assertion that the trial court violated 42 Pa.C.S.A. § 9781(c) when fashioning his sentence is curious, as section 9781(c) governs appellate review of a sentence, and thus, this statute is incapable of "violation" by the trial court, as Welsh contends. *See id.*

problems, the apparent deterioration of his mental health (as the shooting exhibited), his status as a World War II veteran, and his character and reputation in the community. Welsh's Brief at 26-30. In its written opinion, the trial court provides the following explanation for its sentence:

> At sentencing, this [c]ourt considered the following mitigating factors in favor of Welsh: his advanced age; his military record; his lack of criminal history; his physical condition; and his historical ability to provide for his family and community. There was no credible evidence presented at trial or sentencing that Welsh suffered from any mental defect or diminished mental capacity. This [c]ourt reviewed the sentencing guidelines, the pre-sentence report, and all of the letters of support written on behalf of Welsh. This [c]ourt further listened to all of the witnesses who spoke on behalf of Welsh and [the victim]. Based upon all of these relevant factors, this [c]ourt determined that the gravity of the offense and the manner in which Welsh committed this crime necessitated incarceration.
>
> … [The victim] and Welsh had an approximate thirty (30) year relationship that was for the most part, an extremely positive relationship. Their relationship deteriorated when [the victim] began to demolish the property across the street from Welsh's residence/funeral home. Then, on July 26, 2013, Welsh, without adequate provocation, shot [the victim] twice in the back of the head as he was walking away from the confrontation started by Welsh. Given the facts of this case, if Welsh had not been 90 years of age, his sentence would likely have been twice as long.

Trial Court Opinion, 6/9/2015, at 6-7.

Our review of the record reveals that the trial court did in fact take into consideration all of the mitigating factors Welsh claims it failed to consider.[8] *See* N.T., 7/31/2014, at 74-77. Moreover, as stated, the trial court had the benefit of a presentence investigation report when fashioning Welsh's sentence. It is therefore presumed "that the sentencing judge was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Walls*, 926 A.2d 957, 967 n.7 (Pa. 2007) (quoting *Commonwealth v. Devers*, 546 A.2d 12, 18 (Pa. 1988)).

As Welsh's sentence was within the sentencing guidelines, we may only reverse the trial court's decision if "the application of the guidelines would be clearly unreasonable." 42 Pa.C.S.A. § 9781(c)(2). We note that the trial court had the opportunity to observe Welsh and his presentence investigation report, considered all mitigating factors involved, and provided a sound basis for the imposition of its sentence, which was below the mitigated range of the sentencing guidelines. *See* 42 Pa.C.S.A. § 9781(d). This was a serious offense with the gravest of consequences. As such, we have no basis to conclude that Welsh's sentence is unreasonable. Finding no abuse of discretion, we affirm the judgment of sentence.

---

[8] We further find no basis to reverse the trial court as a result of its imposition of what Welsh terms a "life sentence." Welsh's Brief at 28. Arguably, any sentence of incarceration could be a life sentence for Welsh, a nonagenarian with health problems.

- 15 -

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/29/2015